IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JACK I. SHAW, <br><br> Plaintiff, <br><br> v. <br><br> KERRY CARSON, <br><br> Defendant. | CIVIL ACTION NO.: 4:21-cv-204 |

**O R D E R**

Plaintiff Jack Shaw, proceeding *pro se* and *in forma pauperis*, alleges Defendant Kerry Carson violated his Fourth Amendment rights when she arrested him on July 8, 2019. (See doc. 1.) Defendant has moved for summary judgment on the claim against her. (Doc. 87.) For the reasons below, the Court finds that Plaintiff has supported none of his claims with enough evidence to survive summary judgment. Moreover, even if a genuine dispute of material fact existed as to the merits of Plaintiff's claims, Defendant would be shielded from Plaintiff's federal claims by qualified immunity. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment. (Id.)

BACKGROUND

I. **Procedural Background**

This 42 U.S.C. § 1983 action arises out of a traffic stop instigated by Defendant Carson, an officer with the Pooler Police Department, on July 8, 2019. Plaintiff filed this suit on July 13, 2021. (Doc. 1.) Plaintiff's Complaint named seven Defendants (including Defendant Carson) and asserted numerous claims against those Defendants, (see id.), but all of the claims except for one (the one against Defendant Carson) have been dismissed, (see docs. 11, 14, 60, 63 & 65). The sole

remaining claim is that Defendant Carson violated Plaintiff's Fourth Amendment rights by arresting him without probable cause.

Defendant Carson moved for summary judgment on October 11, 2024. (Doc. 87.) Plaintiff filed a Response, (doc. 90), Defendant filed a Reply, (doc. 92), and Plaintiff filed a Sur Reply, (doc. 93).[1] In accordance with Local Rule 56.1, Defendant submitted a Statement of Material Facts and Conclusions of Law, (doc. 87-4), along with excerpts from Plaintiff's deposition, footage from Defendant's body worn camera, and Defendant's responses to Plaintiff's interrogatories, (docs. 87-1, 87-2 & 87-3.). Plaintiff did not file a response to the Statement of Material Facts, nor did he submit any evidence or exhibits supporting the factual assertions in his briefs. (See docs. 90 & 93.) The Court deems admitted all portions of Defendant's statements having evidentiary support in, and not otherwise contradicted by, the record and which are not properly opposed by Plaintiff as contemplated under Federal Rule of Civil Procedure 56.[2] See Loc. R. 56.1; Fed. R. Civ. P. 56(e); see also Williams v. Slack, 438 F. App'x 848, 849–50 (11th Cir. 2011) (*per curiam*) (finding no error in deeming defendants' material facts admitted where *pro se* prisoner failed to respond with specific citations to evidence and otherwise failed to state valid objections); Scoggins v. Arrow Trucking Co., 92 F. Supp. 2d 1372, 1373 n.1 (S.D. Ga. 2000) (same). Defendant continues to shoulder the burden of demonstrating the absence of any genuine issue of material fact

---

[1] In her Reply, Defendant argues that Plaintiff's Response, (doc. 90), "is untimely and should not be considered in the Court's evaluation" of Defendant's Motion. (Doc. 92, p. 1.) While the Court agrees with the Defendant that Plaintiff's response was untimely filed, in consideration of the Plaintiff's *pro se* status, and the fact that his Response was filed only three days late, the Court has considered Plaintiff's response as if it were timely filed.

[2] Pursuant to Federal Rule of Civil Procedure 56, a party disputing a fact must cite "to particular parts of materials in the record," and any affidavit or declaration used to oppose a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(1) & (4).

and the Court will review the entire record "to determine if there is, indeed, no genuine issue of material fact." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009).

## II.     Factual Background

On July 8, 2019, Plaintiff was driving a vehicle in Pooler, Georgia, when he noticed that a tire on the vehicle "felt funny." (Doc. 87-4, p. 1.) Plaintiff pulled over, noticed the tire was flat, and determined he needed to use a jack to elevate the car and change the tire. (Id.) Plaintiff then reversed his car down the active roadway until he reached a curb that formed the boundary of a right-hand turn lane and maneuvered the car so that the front passenger tire was on the curb. (Id. at p. 2.) Plaintiff believed that putting the flat tire up on the curb would allow him to fit the car jack under the car. (Id.)

Defendant arrived as Plaintiff's car sat with the front right tire on the curb and the rest of the car in the roadway. (Id.) Attempting to determine whether Plaintiff had hit the curb (resulting in the flat tire), Defendant asked Plaintiff if he "[had] a flat and [he] drove up here, or [if he] drove up on the curb and got a flat." (Id. at pp. 2–3.) Plaintiff responded, "Yeah, yeah, yeah." (Id. at p. 2.)

Defendant asked Plaintiff if he was also having engine issues, and Plaintiff told her that he was "trying to see where [he] could slide this jack under here." (Id. at p. 3.) Defendant advised Plaintiff that he "might have to get [the car] down off the curb because otherwise it's going to be unsteady." (Id.) Plaintiff disagreed and insisted that he needed the car up on the curb to get the jack underneath. (Id.) Defendant asked Plaintiff if she could call roadside assistance for him, which he declined, and she asked him if he had any other damage, to which he told her he did not. (Id.)

Defendant then looked to see if there was anything in plain view in Plaintiff's vehicle before she returned to her police vehicle to run Plaintiff's tag number. (Id.) After running the tag

3

number, Defendant discovered that the owner of the vehicle—Paul Andrew Shaw—had a suspended driver's license. (Id.) At this time, Plaintiff had not identified himself to Defendant and had not told Defendant he was not the owner of the vehicle. (Id. at p. 4.) While at her vehicle, Defendant requested that another officer come to assist her on scene. (Id.) Defendant returned to Plaintiff and asked if he had his driver's license on him. (Id.) Plaintiff refused to provide his license and became angry and agitated. (Id. at pp. 4–5.)

Plaintiff continued working on the tire, ignoring Defendant. (Id. at p. 5.) After about two minutes, Plaintiff stood up and produced his passport card, instructing Defendant to "run" it. (Id.) Defendant briefly looked at the passport card before putting it in her pocket. (Id.) Plaintiff continued working on the car while ignoring Defendant for several minutes and then he stopped to ask her if she had run his passport card. (Id. at p. 6.) Defendant responded, "No, sir . . . I asked for your driver's license first." (Id.) Plaintiff again refused to provide his driver's license, and Defendant refused to return Plaintiff's passport card. (Id.)

Plaintiff then walked to the front of his vehicle, stooped over, detached the tire iron from the jack, and approached Defendant with the tire iron in his hand. (Id.) As Plaintiff neared Defendant, he brought the tire iron from his left hand, across the front of his torso, and took the tire iron by his right hand. (Id.) Defendant asked Plaintiff to put down the tire iron multiple times before Plaintiff dropped the iron and reached for something else on the ground. (Id. at pp. 6–7.) As Plaintiff reached toward the ground, Defendant drew her taser and pointed it at Plaintiff. (Id. at p. 7.) When Plaintiff turned around with a large, black object in his hand, Defendant again said, "Put it down." (Id.) Plaintiff saw Defendant's taser and said, "Oh, that's good. Don't use that. Use your gun. Where's your gun at?" (Id.) The body worn camera footage shows that Plaintiff then dropped the object. (Doc. 87-2 at 12:35.) Plaintiff continued to walk around, ignoring Defendant and her drawn taser. (Doc. 87-4, p. 7.) Defendant did not deploy her taser. (Id.)

4

At this time, another Pooler officer arrived on scene. (Id.) Plaintiff, Defendant, and the second officer on scene began having a heated conversation during which Plaintiff used profanities and continued to gesture wildly and argue with the officers. (Id. at pp. 7–8.) The second officer asked for Plaintiff's identification and Plaintiff said, "Right there she's got it," referring to the passport card he previously gave Defendant. (Id. at p. 8.) Defendant said, "He will not give me his ID." (Id.) The second officer asked Plaintiff where his ID was and Plaintiff again yelled, "Right there," while pointing at Defendant. (Id.) Defendant said, "He gave me his—he's suspended." (Id.) Plaintiff questioned Defendant and Defendant responded, "Yes sir, your license is suspended which is why I was asking for it." (Id.) Plaintiff denied that his license was suspended and asked Defendant for the name on the suspended license. (Id.) The second officer took Plaintiff's passport card from Defendant and said, "This is a passport card. This is not a valid driver's license." (Id.) Plaintiff said, "I know that." (Id.) Defendant stated, "He won't give me his driver's license." (Id.) Plaintiff yelled back "I don't need a driver's license." (Id.) The second officer said, "You need . . . a license," and Plaintiff replied, "No, I do not." (Id.) The second officer told Plaintiff he needed his driver's license and Plaintiff asked Defendant to return his passport card. (Id. at p. 9.) The second officer tried to corral Plaintiff, and said, "Stay right there." (Id.) Plaintiff asked the second officer to return his passport card to him. (Id.) The second officer told Plaintiff that Plaintiff would get his passport card back when he provided his driver's license. (Id.) Plaintiff responded, "You aren't getting my ID. You don't need it. There's no law that says you gotta have it." (Id.)

The second officer asked Defendant what she ran and Defendant told him she ran the tag. (Id. at p. 10.) Plaintiff interjected and said, "Don't run the . . . tag, run that . . . thing right there," as he tried to come towards Defendant while flailing his arms.³ (Id.) The second officer tried to

---

³ Plaintiff later testified that one officer asked Plaintiff if he was going to hurt Defendant. (Doc. 87-4, p.

5

contain Plaintiff and told him to "stop threatening the officer." (Id.) Plaintiff shouted, "I'm not threatening anybody." (Id.) The second officer said, "You keep pointing your finger and getting loud, we're trying to talk to you here." (Id.) As Plaintiff continued yelling and gesturing at the second officer, a third officer who had recently arrived arrested Plaintiff. (Id.)

Plaintiff was charged with five crimes: failure to maintain lane, obstruction of a law enforcement officer, aggravated assault on a police officer, disorderly conduct, and terroristic threats and acts. (Id.) The day after Plaintiff's arrest, he was brought before a judicial officer who denied bond. (Id.) Two days later, Plaintiff reappeared in court and was given bond. (Id.) In total, Plaintiff spent three days in jail. (Id.) Nearly four years after the incident, on September 8, 2023, the district attorney's office declined to prosecute the charges against Plaintiff because the "[a]rresting officer ha[d] relocated outside of the jurisdiction of the Court." (Id. (quoting doc. 50, p. 3).) The State filed a nolle prosequi and the charges against him were dismissed. (Id.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing there is no genuine dispute as to any material fact. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there

---

10.) Plaintiff testified that he responded, "I wouldn't hurt her . . . if I wanted to hurt her, I would have shot her." (Id.) Plaintiff testified that "[i]t wasn't nothing meant by it. I had a gun on me." (Id. at p. 11.)

are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party has the burden of proof at trial, the moving party may discharge his burden by showing the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to present affirmative evidence to show a genuine issue of fact. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., Fla., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis and citations omitted).

## DISCUSSION

Defendant contends she is entitled to summary judgment on Plaintiff's sole remaining claim—that Defendant violated Plaintiff's Fourth Amendment rights when she arrested him—because she had probable cause to arrest him for "at least one arrestable offense." (Doc. 87, p. 19.) Defendant also invokes qualified immunity. (Id. at pp. 12–13.) In response, Plaintiff argues that Defendant prolonged the traffic stop in violation of the Fourth Amendment and that Defendant lacked probable cause to arrest him.[4] (See doc. 90.) For the reasons explained below, the Court

---

[4] In his Response, Plaintiff primarily argues that Defendant's testimony to the court in Plaintiff's criminal

finds that Defendant had reasonable suspicion to initiate the traffic stop, that Defendant had reasonable suspicion to prolong the traffic stop, that Defendant had probable cause to arrest Plaintiff, and that Defendant is entitled to qualified immunity.

**I.      Defendant had Reasonable Suspicion to Initiate the Traffic Stop**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons [and] houses . . . against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.  A traffic stop is a seizure within the meaning of the Fourth Amendment and is justified when the police have reasonable suspicion that a traffic violation has occurred.  United States v. Campbell, 26 F.4th 860, 880 n.15 (11th Cir. 2022) (en banc) ("[W]hile probable cause is sufficient, only reasonable suspicion is necessary.")  To have reasonable suspicion, an officer must "have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity."[5] United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000).  "The 'reasonable suspicion' must be more than 'an inchoate and unparticularized suspicion or hunch.'"  Id. (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)).  The Court looks to the "totality of the circumstances" to determine whether an officer had "a particularized and objective basis for suspecting legal wrongdoing."  United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).

---

proceedings "was not an accurate representation of the facts or events that unfolded at the scene" and "constitutes perjury."  (Doc. 90, p. 2.)  Plaintiff argues that the "discrepancies between [Defendant's] testimony and the video evidence create genuine disputes of material fact" and he thus "*motions to **impeach the 'false' testimony** presented by Officer Kerry Carson*."  (Id. at pp. 2, 10.)  The Court will not consider Plaintiff's arguments about perjury as they are not relevant to Plaintiff's false arrest claim at issue in this Motion.  Footage of the traffic stop was captured by Defendant's body worn camera ("BWC"), which the Court has reviewed.  (Doc. 87-2.)  The BWC footage confirms Defendant's Statement of Material Facts.  Based on the Court's review of the record before it, the Court has observed no material factual discrepancies hindering the issuance of summary judgment.

[5] Criminal activity includes even minor traffic violations.  See United States v. Chanthasouxat, 342 F.3d 1271, 1277 (11th Cir. 2003).

While Plaintiff cites United States Supreme Court cases, which he argues "highlight the importance of reasonable suspicion in police interactions," he does not expressly dispute that Defendant had an objectively reasonable basis to initiate the traffic stop. (Doc. 90, p. 4.) Upon seeing Plaintiff's car partially pulled onto the curb and partially extending into the roadway, Defendant approached the scene to investigate a potential accident or traffic violation. (Doc. 87-4, pp. 2–3.) Plaintiff admits that Defendant suspected Plaintiff may have been involved in an accident and that Defendant had a duty to investigate potential accidents. (Id. at p. 2.) The hazardous positioning of Plaintiff's car provided Defendant with the necessary reasonable suspicion to justify the stop. Accordingly, there is no genuine dispute of material fact as to whether Defendant violated Plaintiff's Fourth Amendment rights in initiating the stop.

**II.     The Duration of the Traffic Stop was not Unlawfully Prolonged**

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." Rodriguez v. United States, 575 U.S. 348, 350 (2015). While "[a] seizure for a traffic violation justifies a police investigation of that violation," such a seizure is generally expected to be a "relatively brief encounter" and "the tolerable duration . . . in the traffic-stop context is determined by the seizure's 'mission.'" Id. at 354 (citations omitted). A traffic stop's mission is "to address the traffic violation that warranted the stop . . . and attend to related safety concerns." Id. The traffic stop thus may "'last no longer than is necessary' to complete its mission." Campbell, 26 F.4th at 882 (quoting Rodriguez, 575 U.S. at 354). An officer may "conduct certain unrelated checks during an otherwise lawful traffic stop," as long as such activities do not "measurably extend" the duration of the stop. Rodriguez, 575 U.S. at 355. "Authority for [a] seizure [for a traffic violation] ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. at 349. "[A] traffic stop prolonged beyond that point is unlawful." Id. at 357 (internal citations and

quotations omitted). An officer unlawfully prolongs a stop when she "(1) conduct[s] an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion." Campbell, 26 F.4th at 884.

Plaintiff argues that the traffic stop should have ended when Defendant examined his passport card showing his name as "Jack Ivan Shaw" and not "Paul Andrew Shaw," the owner of the car and driver with the suspended license. (Doc. 90, p. 5.) Defendant, however, argues that at this point, Plaintiff "had already committed at least one arrestable offense," providing Defendant with reasonable suspicion to prolong the stop to wait for back up and to obtain Plaintiff's license. (Doc. 92, p. 4.) Part of a traffic stop's mission is to attend to related safety concerns, which "includes a traditional set of 'ordinary inquiries incident to the traffic stop,'" including checking the driver's license. Baxter v. Roberts, 54 F.4th 1241, 1259 (11th Cir. 2022) (quoting Rodriguez, 575 U.S. at 355). Checking a driver's license is "part of the stop's mission because [it] 'serve[s] the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.'" Id. It is also well established "that officers conducting a traffic stop may 'take such steps as [are] reasonably necessary to protect their personal safety." United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)).

Throughout the stop, Defendant's only inquiries aimed to investigate the incident which led to Plaintiff's car being partially on the curb and partially in the road and investigating Plaintiff's driver's license. To the extent that Defendant's waiting for back up and continued request for Plaintiff's driver's license constituted "unrelated inquiries aimed at investigating other crimes" adding time to the stop, Defendant had reasonable suspicion to prolong the stop, thus she did not do so unlawfully. Campbell, 26 F.4th at 884; see also Purcell, 236 F.3d at 1277–78 ("[O]fficers conducting a traffic stop may . . . prolong the detention to investigate the driver's license . . . .").

10

Plaintiff refused to provide his driver's license after Defendant—and other officers—made repeated requests. (See doc. 87-4, pp. 3–9.) Defendant had reasonable suspicion that Plaintiff was operating a vehicle without a driver's license and she also had reasonable suspicion (at the very least) that Plaintiff had violated Georgia law by refusing to provide his license to her. Accordingly, Defendant did not unlawfully prolong the traffic stop.

### III. No Reasonable Juror Could Find that Defendant Lacked Probable Cause to Arrest Plaintiff

"[A] warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." Carter v. Butts Cnty., 821 F.3d 1310, 1319 (11th Cir. 2016) (quoting Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996)). "[P]robable cause is a flexible and fluid concept[] that looks . . . to the totality of the circumstances to determine the reasonableness of the officer's belief that a crime has been committed." Paez v. Mulvey, 915 F.3d 1276, 1286 (11th Cir. 2019). Not intended to be a high bar, probable cause "requires [officers to show] only the 'kind of fair probability on which reasonable and prudent people, not legal technicians, [would] act.'" Kayley v. United States, 571 U.S. 320, 338 (2014) (quoting Florida v. Harris, 568 U.S. 237, 244 (2013)). Sufficient probability, and not certainty, "is the touchstone of reasonableness under the Fourth Amendment." Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997) (quoting Hill v. California, 401 U.S. 797, 804 (1971)).

Probable cause to arrest "exists when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish 'a probability or substantial chance of criminal activity.'" Baxter, 54 F.4th at 1265 (quoting Washington v. Howard, 25 F.4th 891, 898–99 (11th Cir. 2022)). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth

11

Amendment, arrest the offender." Id. (quoting Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)).

Defendant argues that she "had at least arguable probable cause to believe that Plaintiff had committed at least one arrestable offense," including refusal to display driver's license, O.C.G.A. § 40- 5-29(b)(1); failure to maintain lane, O.C.G.A. § 40-6-48(1); obstruction of a law enforcement officer, O.C.G.A. § 16-10-24(a–b); aggravated assault on a police officer, O.C.G.A. § 16-5-20; disorderly conduct, O.C.G.A. § 16-11-39(a)(1); and terroristic threats and acts, O.C.G.A. § 16-11-37(b)(1)(A), (b)(2)(D). (Doc. 87, pp. 19–23.) Plaintiff contends that Defendant "found no probable cause that a crime was a foot [sic]." (Doc. 90, p. 4.) Whether Defendant possessed probable cause "depends on the elements of the alleged crime and the operative fact pattern." See Brown v. City of Huntsville, 608 F.3d 724, 735 (11th Cir. 2010).

Defendant had probable cause to arrest Plaintiff for failure to produce a license upon request. Georgia law mandates that a driver "display his or her [driver's] license upon the demand of a law enforcement officer." O.C.G.A. § 40-5-29(b)(1).[6] The undisputed facts show that Plaintiff refused to display his driver's license to Defendant after several requests. (See doc. 87-4, pp. 4–9.) Plaintiff contends that he was not required to produce his driver's license to Defendant regardless of Georgia law because Defendant did not possess reasonable suspicion. (Doc. 90, pp. 4–6.) However, Georgia law does not require officers to possess reasonable suspicion to request a driver's license during a traffic stop. O.C.G.A. § 40-5-29(b)(1). Accordingly, Defendant had

---

[6] "No person . . . shall drive any motor vehicle upon a highway in this state unless such person has a valid driver's license . . . ." O.C.G.A. § 40-5-20(a). If a person "is driving without a valid driver's license . . . in his or her possession," in violation of O.C.G.A. § 40-5-20(a), "but he or she has a valid driver's license, Code Section 40-5-29 shall apply to such offense." O.C.G.A. § 40-5-20(a)(2).

probable cause to arrest Plaintiff for failure to produce his driver's license upon request.  See Hale v. Mukes, No. 1:20-CV-146, 2023 WL 7109683, at *5 (M.D. Ga. Sept. 12, 2023).[7]

Plaintiff was ultimately arrested and charged with failure to maintain lane, obstruction of a law enforcement officer, aggravated assault on a police officer, disorderly conduct, and terroristic threats and acts.  (Doc. 87-4, p. 11.)  Because there was probable cause to arrest Plaintiff for failure to produce his license on demand, the Court need not determine if there was probable cause to support arresting him on each of the other charges.  See Hale, 2023 WL 7109683, at *6.

## IV.     Defendant is Entitled to Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  The doctrine "is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."  Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012) (quotations and citations omitted).  As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery."  Holmes v. Kucynda, 321

---

[7] Defendant also clearly had probable cause to arrest Plaintiff for obstruction of a law enforcement officer. Under Georgia law, "a person who knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his or her official duties shall be guilty of a misdemeanor." O.C.G.A. § 16-10-24(a). Plaintiff repeatedly refused to comply with Defendant's—and other officers'—requests for his driver's license, acted in a confrontational and agitated manner, and repeatedly argued with and yelled at the officers. (Doc. 87-4, pp. 4–9.) "Under Georgia law, refusal to comply with an officer's commands is sufficient to form the basis of an obstruction charge." McMullen v. City of Port Wentworth, Ga., No. CV417-067, 2019 WL 4733081, at *5 (S.D. Ga. Sept. 26, 2019) (citing Townsend v. Coffee Cnty., Ga., 854 F. Supp. 2d 1345, 1358 (S.D. Ga. 2011)). Accordingly, Plaintiff's continued refusal to comply with (or to even give a forthright response to) Defendant's lawful commands to produce his driver's license provided Defendant with probable cause to arrest Plaintiff for obstruction of a law enforcement officer.

13

F.3d 1069, 1077 (11th Cir. 2003) (internal quotation marks omitted). But qualified immunity does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)) (internal quotation marks and alteration omitted).

A defendant first must show that she acted within her discretionary authority. Mobley v. Palm Beach Cnty. Sheriff Dep't., 783 F.3d 1347, 1352 (11th Cir. 2015). Specifically, the defendant must show that she "was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within [her] power to utilize." Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). If the defendant makes this showing, the burden shifts to the plaintiff to prove (a) a violation of the Constitution by the defendant, (b) the illegality of which was clearly established at the time of the incident, Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (citations omitted), and the Court has discretion in deciding which of those two prongs to address first, Pearson v. Callahan, 555 U.S. 223, 236 (2009).

After applying the two-step framework here, the Court finds that Defendant is entitled to qualified immunity. First, Plaintiff does not dispute that Defendant was acting within her discretionary authority as a police officer.[8] The undisputed facts show Defendant was performing routine police work at all relevant times. Second, Plaintiff has failed to submit evidence suggesting Defendant violated his clearly established Fourth Amendment rights. On the contrary, as explained in Discussion Section III, supra, Defendant had probable cause to arrest Plaintiff for at least one offense. And even if this were not true, Defendant would still receive qualified immunity

---

[8] Plaintiff argues that "qualified immunity does not protect officers from criminal charges, including perjury." (Doc. 90, p. 8.) As the Court has noted, Plaintiff's discussion of perjury in his Response is not relevant to the false arrest claim at issue in Defendant's Motion. Plaintiff does not otherwise dispute that Defendant is entitled to qualified immunity. (See docs. 90, 93.)

because the undisputed facts show she at least had arguable probable cause for the same reasons, which is "all that is required for qualified immunity to be applicable to an arresting officer . . . ." Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001); see Hardigree v. Lofton, 992 F.3d 1216, 1225 (11th Cir. 2021) ("[I]n cases involving warrantless searches or seizures, law enforcement officers will be entitled to qualified immunity if they had even 'arguable probable cause.'" (quoting Feliciano v. City of Miami Beach, 707 F.3d 1244, 1251 (11th Cir. 2013))). Defendant is therefore entitled to qualified immunity.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment, (doc. 87). The Court **DIRECTS** the Clerk of Court to enter the appropriate judgment for Defendant and to **CLOSE** this case.

**SO ORDERED**, this 24th day of September, 2025.

_____
R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA